**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| QWEST CORPORATION, LEVEL 3 COMMUNICATIONS, LLC, and GLOBAL CROSSING TELECOMMUNICATIONS, INC., | |
| Plaintiffs, | Civil Action No. 21-cv-3004 |
| v. | **COMPLAINT** |
| PEERLESS NETWORK OF ARIZONA, LLC, PEERLESS NETWORK OF WASHINGTON, LLC, PEERLESS NETWORK OF UTAH, LLC, PEERLESS NETWORK OF OREGON, LLC, PEERLESS NETWORK OF NEW MEXICO, LLC, PEERLESS NETWORK OF NORTH DAKOTA, LLC, PEERLESS NETWORK OF MINNESOTA, LLC, PEERLESS NETWORK OF COLORADO, LLC, AIRUS, INC. | |
| Defendants. | |

Plaintiffs Qwest Corporation ("Qwest"), Level 3 Communications, LLC ("Level 3"), and Global Crossing Telecommunications, Inc. ("Global Crossing") (Level 3 and Global Crossing are collectively "Level 3") (Qwest and Level 3 are collectively "Lumen" or "Plaintiffs"), for their Complaint against Defendants Peerless Network of Arizona, LLC, Peerless Network of Washington, LLC, Peerless Network of Utah, LLC, Peerless Network of Oregon, LLC, Peerless Network of New Mexico, LLC, Peerless Network of North Dakota, LLC, Peerless Network of Minnesota, LLC, Peerless Network of Colorado, LLC (collectively referred to as "Peerless"), and Airus, Inc. (Peerless and Airus collectively referred to as "Defendants"), state and allege as follows:

## I.   GENERAL ALLEGATIONS

1.      Lumen and Defendants are telecommunications carriers that, among other things, exchange local, long-distance, and toll-free telephone calls.

2.      The exchange of local calls is governed by interconnection agreements (ICAs) negotiated and entered into pursuant to 47 U.S.C. § 252. The rates contained in ICAs are set according to total element long-run incremental cost ("TELRIC") principles.

3.      The exchange of long-distance calls and toll-free calls are governed by access tariffs filed with the Federal Communications Commission ("FCC") for interstate calling, and with state public utilities commissions for intrastate calling. The rates set forth in tariffs tend to be higher than the TELRIC rates contained in ICAs.

4.      This lawsuit concerns Defendants' fraudulent scheme to disguise toll-free calls as local calls so they would not have to pay Lumen usage-based switched access charges or the higher tariff rates for facilities that Defendants are obligated by law to pay pursuant to Lumen's interstate and intrastate access tariffs, and by contracts and ICAs between the parties. Defendants' scheme of avoiding mandatory switched access charges also reduced their cost structure, thereby giving Defendants an unfair competitive advantage in the toll-free marketplace.

5.      This lawsuit also concerns Defendants' refusal, in breach of the parties' ICAs, to participate in meaningful negotiations that would have resulted in Qwest assessing a larger percentage of its facilities charges at the higher tariff rates, instead of the lower TELRIC rates.

6.      Defendants' scheme constitutes an unjust and unreasonable practice in violation of the Communications Act, constitutes a fraud, and caused breaches of Lumen's interstate and intrastate access tariffs as well as the parties' ICAs.

7.     Lumen therefore seeks actual, consequential, and punitive damages, as well as late payment charges, interest, costs, and attorneys' fees incurred to obtain the relief to which Lumen is entitled.

## II.     PARTIES

8.     Plaintiffs are wholly owned subsidiaries (whether directly or indirectly) of Lumen Technologies, Inc., a publicly traded corporation.

9.     Qwest Corporation is a national provider of telecommunications services, and is a subsidiary of Lumen Technologies, Inc. (formerly known as CenturyLink, Inc.). Qwest is a Delaware corporation with its principal place of business in Monroe, Louisiana.

10.     Level 3 Communications, LLC is a Delaware limited liability company with its principal place of business in Broomfield, Colorado. It is wholly owned by Level 3 Financing Inc., a Delaware corporation with its principal place of business in Colorado. Level 3 Communications, LLC is also an indirect wholly owned subsidiary of Lumen Technologies, Inc.

11.     Global Crossing Telecommunications, Inc. is a Michigan corporation with its principal place of business in Broomfield, Colorado. Global Crossing is a wholly owned subsidiary of Level 3 Financing Inc.

12.     Peerless Network, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 222 S. Riverside Plaza, Suite 2730, Chicago, Illinois 60606.

13.     The following are each wholly owned subsidiaries of Peerless Network, Inc. having their principal place of business at 222 W. Riverside Plaza, Suite 2730, Chicago, Illinois 60606: Peerless Network of Arizona, LLC, Peerless Network of Washington, LLC, Peerless Network of Utah, LLC, Peerless Network of Oregon, LLC, Peerless Network of New Mexico, LLC, Peerless

3

Network of North Dakota, LLC, Peerless Network of Minnesota, LLC, Peerless Network of Colorado, LLC.

14.     Airus, Inc. is a corporation organized under the laws of the State of Delaware, having its principal place of business at 222 W. Riverside Plaza, Suite 2730, Chicago, Illinois 60606. On information and belief, Airus, Inc. is a wholly owned subsidiary of Peerless Network, Inc.

### III.     JURISDICTION AND VENUE

15.     This Court has original jurisdiction over the claims in this Complaint arising from Defendants' violations of the Communications Act and Defendants' breaches of the Lumen interstate tariffs filed with the Federal Communications Commission pursuant to 28 U.S.C. §§ 1331 and 1337, as it has original jurisdiction over all actions arising under the Communications Act and the Parties' interstate access tariffs.

16.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over all other claims in this Complaint because they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

17.     This Court has personal jurisdiction over Defendants Peerless Network of Arizona, LLC, Peerless Network of Utah, LLC, Peerless Network of New Mexico, LLC, Peerless Network of North Dakota, LLC, Peerless Network of Colorado, LLC and Airus, Inc. because they have contractually agreed to litigate disputes involving their ICAs before this Court.

18.     This Court has personal jurisdiction over Peerless Network of Minnesota, LLC, Peerless Network of Oregon, LLC, and Peerless Network of Washington, LLC because, these Defendants have done substantial business in this district including negotiating the ICAs at issue

in this dispute such that they should reasonably and fairly anticipate being called into court in this District. In addition, on information and belief, the Defendants route traffic to or from this district, assess charges and/or prevent Lumen from assessing charges on such calls, which charges underlie the complaint in this case. In addition, the claims against these defendants are all part of the same transaction and occurrence that give rise to the dispute with the Defendant entities that have pre-selected the District of Colorado as a forum. As such, the Defendants have established sufficient minimum contacts with the district so that an exercise of personal jurisdiction over them would not offend traditional notions of fair play and substantial justice.

19.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the parties have agreed that venue lies before this Court and/or because a substantial part of the events or omissions giving rise to these counterclaims occurred in this district.

## IV.     OVERVIEW OF THE EXCHANGE OF TRAFFIC

20.     The telecommunications industry sets different legal obligations, standards, and practices for the exchange of local calls, long-distance calls, and toll-free calls.

### A.  Local Calls

21.     Local calls are calls that originate and terminate within the same local calling area.

22.     Local calls are generally governed by interconnection agreements (ICAs) and are transported over Local Interconnection Service otherwise known as LIS trunk groups. LIS trunks are priced based on TELRIC principles.

### B.  Long-Distance Calls

23.     Long-distance calls are calls that originate within one local calling area and terminate within another.

24.     Completing long-distance telephone calls generally requires the coordination of at least two different types of telecommunications providers: long-distance carriers (also known as interexchange carriers, or "IXCs") and local exchange carriers (known as "LECs").

25.     To complete a long-distance telephone call, the LEC serving an end user making the call usually routes that call to the network of an IXC, which then usually routes that call to the LEC that serves the end user receiving the call.

26.     LECs assess IXCs switched access charges from interstate and intrastate access tariffs for the work performed in helping an IXC originate or terminate a long-distance call.

27.     When a LEC serves (directly or indirectly) an end user making a long-distance telephone call, the LEC provides what is known as originating switched access service.

28.     When a LEC serves (directly or indirectly) an end user receiving a long-distance telephone call, the LEC provides what is known as terminating switched access service.

29.     Long-distance calls are generally routed over Feature Group D trunk groups that other carriers order out of the LEC's interstate and/or intrastate access tariffs.

### C. Toll-Free Calls

30.     Toll-free calls are those starting with the prefix 800, 866, 877, 888, etc. Toll-free calling is often referred to as "8YY calling."

31.     Toll-free calling is always considered an interexchange service for which switched access charges apply.

32.     When making traditional long-distance calls (meaning not toll-free calls), the end user customer making the calls pre-selects his/her long-distance provider. Once the end user dials the long-distance number, the LEC serving the end user routes the long-distance call to the end-

user customer's pre-selected long-distance carrier. This allows the pre-selected long-distance carrier to track each individual long-distance call so it can bill its end-user customer.

33.     8YY calling is different. Instead of the person making the call paying for the long-distance charges, the company being called—i.e., the company to whom the 8YY calls are routed—pays the long-distance carrier. In other words, the toll-free call is "free" to the person making the call, but not to the company receiving the call.

34.     Instead of the end-user making the call pre-selecting the long-distance carrier, the customer (usually a company) that receives toll-free calls selects the long-distance carrier.

35.     The long-distance carrier that is connected to a particular 8YY telephone number (i.e., the IXC selected by the company to whom the 8YY calls are routed) tracks the volume of calls associated with each of its 8YY numbers, and bills the company to whom the 8YY calls are routed.

36.     The telecommunications industry maintains a database associating each 8YY number with its associated IXC. The database is called the SMS Database or SMS/800 Database.

37.     SMS/800, Inc. has a tariff on file with the FCC that identifies responsibilities of what is known as the "Responsible Organization" or RespOrg for a toll-free number. By designating 8YY numbers with CIC 0110 and then concealing the use of CIC 0110, Peerless—as both a designated long-distance carrier and RespOrg—violates provisions of the SMS/800 tariff that define the RespOrg's responsibilities.

38.     When an end user dials an 8YY number, a local exchange carrier performs a database query to identify the IXC associated with the 8YY number in question and routes the 8YY call to that carrier.

39.     Industry standards and the SMS/800 tariff require long-distance carriers to update the SMS Database to ensure that the telecommunications industry knows which 8YY numbers are associated with each IXC.

40.     When a long-distance provider is associated with a particular 8YY number, the long-distance carrier is supposed to populate the SMS Database with its "carrier identification code" or "CIC." That CIC tells the LEC performing the 8YY database query how to send calls to the long-distance carrier identified by the CIC in the SMS Database and ensures that carriers assess appropriate intercarrier compensation charges.

41.     Peerless's CIC is 7771.

42.     Airus's CIC is 7337.

43.     The IXC associated with an 8YY number (the 8YY service provider) is responsible for paying the LEC originating the call originating switched access charges and 8YY query charges set forth in the LEC's interstate and/or intrastate tariffs.

**V.     CIC-0110 PRESENTS UNIQUE 8YY ISSUES**

44.     CIC 0110 was created as an exception to the general routing of 8YY calls. CIC 0110 was created so LECs could complete toll-free calls that would not be delivered using a traditional long-distance carrier.

45.     Historically, 8YY calls sent to CIC 0110 were for intraLATA toll calls.

46.     Historically, a LATA (Local Access Transport Area) defined the areas within which Bell Operating Companies ("BOCs"), like Qwest, could carry a call.

47.     IntraLATA long-distance calls were short long-distance calls that historically only BOCs could carry. Traditional long-distance carriers like AT&T, Corp. could carry interLATA calls.

48.     Limitations on intraLATA calling have changed due to statutory changes imposed by Sections 271 and 272 or the Telecommunications Act of 1996. *See* 47 U.S.C. §§ 271–272.

49.     CIC 0110 is a pseudo CIC that does not specify the IXC associated with the 8YY number being called. Instead, CIC 0110 calls are routed as if they are local calls, over LIS trunks or local trunk groups.

50.     According to SOMOS, some IXCs are abusing CIC 0110 to circumvent the billing and payment of tariffed originating switched access charges.

51.     Defendants populate many of the 8YY numbers for which they are the designated IXC with CIC 0110 to make it appear that the calls should be routed as if they were local calls.

52.     On 8YY numbers for which they are the designated IXC, Defendants populate the SMS database with CIC 0110 instead of their own CICs so that calls are mis-routed by the originating LEC over local trunk groups so Defendants can (a) attempt to avoid their obligation to pay originating switched access charges and 8YY query charges to that LEC, and (b) create a competitive advantage in the toll-free marketplace.

53.     The use of CIC 0110 for this purpose is an arbitrage mechanism, and is, in and of itself, an unjust and unreasonable practice in violation of 47 U.S.C. § 201(b).

54.     In August 2006, Qwest sent the telecommunications industry a Network Disclosure Announcement pursuant to 47 C.F.R. § 51.325 *et seq*. stating that it "does not authorize the use of CIC 0110 to route IntraLATA Toll-Free traffic on Qwest's network." Defendants' CIC 0110 scheme also violated FCC rules concerning network disclosure.

55.     All long-distance and toll-free calls are supposed to be transported over FGD trunks, and have switched access charged applied to them.

56.     However, irrespective of the trunk groups a call traverses, if the call is a long-distance call or toll-free call, Lumen's interstate and intrastate access tariffs apply to the call, and payment of usage-based switched access charges is mandatory.

## VI.     DEFENDANTS USE OF CIC 0110 TO ROUTE CALLS VIOLATES CONTRACTS WITH BOTH LEVEL 3 AND QWEST CORPORATION.

### A.    *The Qwest-Peerless and Qwest-Airus ICAs*

57.     Qwest is the BOC for 14 of the 50 states within the United States: Arizona, Colorado, Idaho, Iowa, Minnesota, Montana, Nebraska, New Mexico, North Dakota, Oregon, South Dakota, Utah, Washington, and Wyoming.

58.     Peerless and Qwest entered into a series of interconnection agreements pursuant to 47 U.S.C. § 252. At a minimum, Peerless's ICAs with Qwest in the states of Arizona, Colorado, Minnesota, Nebraska, New Mexico, North Dakota, Oregon, Utah, and Washington are at issue in this dispute (hereinafter "Peerless ICAs").

59.     The Peerless ICAs in Arizona, Colorado, Nebraska, New Mexico, North Dakota, Oregon, and Utah all state that disputes between the parties involving the ICAs will be brought to the Federal District Court for the District of Colorado.

60.     In addition, Qwest entered into a series of interconnection agreements with Airus pursuant to 47 U.S.C. § 252. At a minimum, Airus's ICAs with Qwest in the states of Idaho, Iowa, Montana, Nebraska, South Dakota, and Wyoming are at issue in this dispute (hereinafter "Airus ICAs").

61.     The Airus ICAs all state that disputes between the parties involving the ICAs will be brought to the Federal District Court for the District of Colorado.

62.     The Peerless ICAs and Airus ICAs all contain similar language concerning the exchange of traffic. They all state that "transit traffic does not include traffic carried by Interexchange Carriers.…"

63.     The 8YY traffic in issue routed using CIC 0110 is not EAS/Local, intraLATA toll, or Transit Traffic as defined in these ICAs. All originating 8YY traffic is supposed to be routed over FGD facilities and sent directly to the designated RESP-ORG. Under the Peerless and Airus ICAs, the rates, terms, and conditions that apply to toll-free calling is supposed to come from applicable intrastate and interstate access tariffs.

64.     Defendants' abuse of CIC 0110 disguises the true jurisdiction of 8YY calls and causes 8YY calls to be misrouted by the originating LEC over LIS facilities, instead of FGD facilities. This prevented Qwest from assessing originating switched access charges to Peerless— the designated IXC on the toll-free calls in question—in the ordinary course of business.

65.     Qwest back-billed Defendants two years of originating usage-based switched access charges on November 14, 2019. Defendants have refused to pay these charges.

66.     When assessing charges on LIS trunks, the ICAs entitle Qwest to assess facilities charges based upon the percentage of traffic that traverses those facilities which is access versus the percentage of traffic that is local. Qwest bills the percentage of calling that is local at lower TELRIC rates, and the percentage that is non-local at the higher rates in the access tariffs.

67.     By disguising toll-free calls as local calls using CIC 110, Defendants received facilities at lower rates than they should have in breach of the parties' ICAs and as a consequence of the fraudulent scheme.

68.     Qwest back-billed the appropriate facilities charges to Defendants in November 2020.

69.     Defendants have refused to pay these charges.

70.     The Peerless and Airus ICAs all contain a provision stating:

> 7.2.1.3.1 Switched Access Traffic, including but not limited to InterLATA Traffic, other than Toll VoIP-PSTN Traffic or Jointly Provided Switched Access Traffic, may not be exchanged under this Agreement. In the event CLEC routes InterLATA Traffic to CenturyLink in violation of this section, CenturyLink shall be entitled to seek injunctive relief and to recover damages, including without limitation, compensation for such traffic at the rate that is then applicable to such access traffic.

71.     Among other things, Qwest seeks damages and injunctive relief as contemplated by this provision of the ICAs. Defendants' intentional and fraudulent scheme caused Qwest both actual damages and consequential damages.

### B.  The Level 3-Peerless Contract

72.     Level 3 entered into a Services Agreement with Intelepeer on January 11, 2010.

73.     Peerless acquired Intelepeer and specifically adopted the January 11, 2010 Services Agreement on June 3, 2014 (hereinafter, "Level 3-Peerless Contract").

74.     On June 3, 2014, the Level 3-Peerless Contract was amended to cover traffic originated by Level 3 and routed to Peerless (including Airus).

75.     The Level 3-Peerless Contract contains the following provision: "'Transit Traffic' means Local Traffic and IntraLATA Toll Traffic that: (i) is originated by an LSP [local service provider] or by an end user of the LSP; (ii) transits from the LSP to Peerless over direct interconnection facilities at an agreed upon locations; and (iii) terminates to the other LSP's telephone number. *Transit Traffic excludes all other traffic types or jurisdictions, including but not limited to 1+ dialed or translated 8YY traffic that appears to be Local Traffic or IntraLATA Toll traffic based upon calling and called number.*" (Emphasis added.)

76.     The Level 3-Peerless Contract states that for traffic that is not transit traffic, appropriate intrastate switched access rates shall apply to the traffic.

77.     8YY traffic routed to CIC 0110 is not transit traffic under the Level 3-Peerless Contract.

78.     Peerless violated the Level 3-Peerless Contract by using CIC 0110 to disguise toll-free long-distance traffic as transit traffic, which caused 8YY calls for which Defendants were the designated IXC to be routed over local trunks.

79.     Peerless populated the SMS database with CIC 0110 on many of the 8YY numbers for which Peerless was the designated IXC. This caused Level 3 to (a) route the calls as "transit traffic," contrary to the expectations of the Parties as set forth in the Level 3-Peerless Contract; and (b) not assess Peerless originating switched access charges and 8YY query charges per the rates, terms, and conditions of Level 3's interstate and/or intrastate access tariffs.

80.     Peerless's intentional and fraudulent scheme caused Level 3 both actual damages and consequential damages.

## VII.    DEFENDANTS REFUSED TO NEGOTIATE ACCURATE LIS-FACILITY-PVU FACTORS WITH QWEST

81.     In November 2011, the FCC issued its Transformation Order (*In the Matter of Connect America Fund*, 26 FCC Rcd. 17663 (2001)), which impacted many aspects of how carriers exchange traffic.

82.     In this Order, the FCC concluded that LECs, like Qwest, had to permit CLECs, like Peerless and Airus, to send all VoIP calls—both local and long-distance—to the LEC for termination over LIS trunk groups.

83.     Historically, LIS trunk groups were used exclusively for the exchange of local and intraLATA traffic.

84.     As a result of this historical requirement, the parties created contractual provisions to address this subject. All of the Peerless ICAs and Airus ICAs contain these provisions; some are contained in the original ICAs and others as a contract amendment.

85.     The Peerless ICAs and Airus ICAs all state that:

a.     "CLEC and CenturyLink will exchange Toll VoIP-PSTN Traffic at rates identified in each Party's appropriate access tariff…. CLEC and CenturyLink will exchange Toll VoIP-PSTN Traffic at rates identified in each Party's appropriate access tariff…."

b.     "InterLATA Traffic which is Toll VoIP-PSTN Traffic will be exchanged at each Party's interstate access tariff rates. Any Transit Traffic which is both interLATA and Toll VoIP-PSTN will be exchanged at each Party's interstate switched access service rates…."

c.     "IntraLATA Toll Traffic which is Toll VoIP-PSTN Traffic will continue to be exchanged at each Party's intrastate access tariff rates."

d.     "The portion of LIS facilities used for Toll VoIP-PSTN Traffic will be billed at CenturyLink's interstate access tariff rates after the application of Relative Use Factor. CenturyLink will use the Local Interconnection Service Facilities Percent VoIP Usage (LIS-Facility-PVU) factor in Exhibit A to determine the portion of Entrance Facility, Direct Trunk Transport, and MUX that shall be deemed the portion of the facility used to carry Toll VoIP-PSTN Traffic."

86.     These ICAs all contemplate that usage-based switched access charges and switched access facility charges will apply to all long-distance calls per the terms of Qwest's interstate and intrastate access tariffs.

87. The original Exhibit As in the Peerless and Airus ICAs all set the LIS-Facility-PVU factor to 0.0 percent.

88. However, the Peerless ICAs and Airus ICAs contained legal obligations to make sure the Exhibit As were updated to include current and accurate information. The Peerless and Airus ICAs all contain the following provision:

> CLEC and CenturyLink will exchange Local VoIP-PSTN Traffic on the same basis and at the same rates as Exchange Service (EAS/Local) Traffic and such Local VoIP-PSTN Traffic will be identified as such by using the originating and terminating call detail information of each call unless the Parties specifically agree otherwise. This call jurisdiction method described herein is intended by the Parties as a proxy to determine the jurisdiction of a call, i.e. the actual geographic end points of the call, and the Parties acknowledge that there may be some circumstances where the actual geographic end points of a particular call may be difficult or impossible to determine. At any time during the term of this Agreement, CLEC and CenturyLink may agree on alternate methods to establish call jurisdiction based on regulatory or technological evolution. ***The Parties agree that it is in the best interest of both Parties to work together in an effort to continue to improve the accuracy of jurisdictional data and such efforts shall not be reasonably withheld by either Party.*** (emphasis added).

89. In February 2018, Qwest provided Defendants with notice that that the amount of Toll VoIP-PSTN Traffic sent over the LIS facilities connecting the parties' networks had increased significantly and, as a result, the LIS-Facility-PVU factor in the ICAs, was significantly understated.

90. Qwest provided Defendants with additional notices on this subject on a periodic basis for years.

91. For over two years, Defendants ignored those notices in violation of the Peerless ICAs and Airus ICAs.

92.    Peerless and Airus refusal to work cooperatively with Qwest to create accurate LIS-Facility-PVU factors constitutes a breach of the parties' ICAs. By acting in this manner, both Peerless and Airus unreasonably withheld efforts to create accurate factors in breach of the ICAs.

93.    While attempting to negotiate new LIS-Facility-PVU factors, Qwest also discovered Defendants' CIC 0110 scheme.

94.    It was not apparent, nor could it have been discovered through reasonable diligence, that Defendants were engaging in an intercarrier compensation arbitrage scheme using CIC 0110. As a result, Qwest discovered this issue shortly before it submitted back-bills to Peerless and Airus regarding usage-based charges on November 14, 2019.

95.    Qwest back-billed for two years of switched access invoices; however, Defendants' intentional and fraudulent scheme would have authorized Qwest Corporation to back-bill far longer than that, and Qwest seeks these additional lost revenues as damages in this lawsuit as well.

96.    Defendants' use of CIC 0110 also caused a larger volume of toll traffic to traverse the LIS trunks. This impacts the LIS-Facility-PVU factor and would have caused that factor to be even higher.

97.    Qwest would never have agreed to a LIS-Facility-PVU factor of 0.0 percent if Defendants had disclosed the fact that they were inappropriately using CIC 0110 to route 8YY calls for which it was the designated IXC.

98.    Defendants' concealment of its CIC 0110 scheme constituted a fraud in the inducement.

99.    Qwest back-billed the appropriate facilities charges to Defendants in November 2020. These back-bills included appropriate facilities charges both due to the high percentage of

VoIP calls and due to the use of CIC 0110, both of which impacted the LIS-Facility-PVU percentage.

100.    Defendants have refused to pay these charges.

101.    As with the usage-based charges described above, Defendants' intentional and fraudulent scheme would have authorized Qwest to back-bill these facilities charges going back far longer than it did. Qwest seeks these additional lost revenues as damages in this lawsuit.

102.    Even to this day, Defendants have refused to provide data and, as a result, Qwest has been unable to negotiate accurate LIS-Facility PVU factors with Defendants.

103.    The existing 0.0 percent factor means Defendants obtain LIS trunks from Qwest Corporation exclusively at the lower TELRIC pricing instead of a percentage of those facilities being billed at the higher FGD prices in Qwest Corporation's access tariffs.

104.    Defendants' payment of facilities charges at TELRIC rates, once again, provides them with a competitive cost advantage in the toll-free market. Thus, Defendants have a financial incentive to refuse to discuss these factors with Qwest Corporation.

105.    Lumen has satisfied all conditions precedent in the ICAs before initiating this lawsuit.

## VIII.   CAUSES OF ACTION

### COUNT I
### (Violation of 47 U.S.C. § 201(b) for Abusing CIC 0110)

106.    Lumen incorporates each of the preceding paragraphs as if fully stated herein.

107.    Under Section 201(b) of the Communications Act, "[a]ll charges, practices, classifications, and regulations for and in connection with [an interstate or foreign] communications service, shall be just and reasonable," and any "charge, [or] practice . . . that is unjust or unreasonable is hereby declared to be unlawful." 47 U.S.C. § 201(b).

108.     As stated above, Defendants populate many of the 8YY numbers for which they are the designated IXC with CIC 0110 to make it appear that the calls are local.

109.     Defendants populate the SMS database with CIC 0110 instead of their own CICs with the specific objective of having the calls traverse local trunks instead of FGD trunks so they can attempt to avoid their obligation to pay the originating switched access charges and 8YY query charges, and to create a competitive advantage in the toll-free marketplace.

110.     The use of CIC 0110 for this purpose is an arbitrage mechanism, a violation of the SMS/800 Tariff, a violation of FCC rules concerning network disclosure, and a violation of FCC rules and decisions mandating payment of switched access charges on 8YY calls, all of which individually and collectively constitute an unjust and unreasonable practice in violation of 47 U.S.C. § 201(b).

111.     Such abusive arbitrage practices to avoid the payment of appropriate charges mandated by law can constitute an unjust and unreasonable practice. *See*, *e.g.*, *AT&T Corp. v. Wide Voice, LLC*, No. BUREAUIDEB-20-MD-005, 2021 WL 2395317, at *6 (Rel. June 9, 2021), *aff'd on reconsideration*, 2021 WL 4500449 (Rel. Sept. 28, 2021).

112.     As a direct and proximate result of Defendants' violations of Section 201(b) of the Communications Act, associated FCC rules and precedents, industry standards, the SMS/800 tariff, and their attempt to avoid and refusal to pay tariff charges as mandated by law, FCC rules, and FCC decisions, Lumen has suffered damages and loss, and is entitled to damages in an amount to be determined at trial, along with interest and reasonable costs and attorneys' fees pursuant to 47 U.S.C. § 206.

## COUNT II
### (Common Law Fraud)

113.     Lumen incorporates each of the preceding paragraphs as if fully stated herein.

114.    Defendants populated many of the 8YY numbers for which they are the designated IXC with CIC 0110 to make it appear that the calls are local.

115.    Defendants' population of the SMS database with CIC 0110 instead of their own CIC constitutes a false representation of material fact.

116.    Defendants knew that by populating the SMS database with CIC 0110 instead of their own CIC they were making a false representation of material fact.

117.    Defendants knew that LECs such as Lumen would not be aware that the 8YY numbers for which they populated the SMS database with CIC 0110 instead of their own CIC were in fact numbers for which Defendants are the designated IXC.

118.    Defendants populated the SMS database with CIC 0110 instead of their own CIC with the specific objective of causing LECs such as Lumen to incorrectly route 8YY traffic and thereby attempt to avoid the originating switched access charges and 8YY query charges that Defendants are obligated to pay as the designated IXC.

119.    Plaintiffs acted in reliance on the information as entered into the SMS database by routing the 8YY calls identified with CIC 0110 over local trunks and not assessing originating switched access charges and 8YY query charges that Defendants are obligated to pay as the designated IXC.

120.    Defendants also withheld this information during the process of negotiating the LIS-Facility-PVU factors, which if disclosed would have impacted the percentages the parties assigned to this factor.

121.    As a direct and proximate result of Defendants' conduct, Lumen has suffered damages and loss, and is entitled to actual and punitive damages in an amount to be determined at trial, along with interest.

122.     As a direct and proximate result of Defendants' conduct, Qwest is entitled to void the original LIS-Facility-PVU factors set forth in Exhibit A's to the Peerless and Airus ICAs.

123.     Lumen also seeks injunctive relief prohibiting Defendants from perpetuating its CIC 0110 scheme, such that it populates the 8YY numbers in SMS database with its actual CICs.

**COUNT III**
**(Breach of Qwest Corporation's Interstate Access Tariffs)**

124.     Lumen incorporates each of the preceding paragraphs as if fully stated herein.

125.     Qwest's interstate access tariffs set forth the rates, terms, and conditions for providing interstate switched access and FGD services to customers, including Defendants.

126.     All interstate long-distance and toll-free calling exchanged between Qwest (as a LEC) and Defendants (as the ultimate IXC) are governed by Qwest's interstate access tariffs, irrespective of the type of trunk group the calls traverse.

127.     Defendants' CIC 0110 scheme caused calls to be misrouted such that calls were routed over LIS facilities instead of FGD facilities. These calls are subject to switched access charges that Defendants are obligated to pay.

128.     Qwest back-billed certain usage-based switched access charges charges on November 14, 2019 and back-billed certain facilities charges in November 2020, and has since continued to assess these charges.

129.     Defendants breached (and continue to breach) the interstate access tariffs by refusing to pay these mandatory charges.

130.     As a direct and proximate result of Defendants' conduct, Qwest has been damaged in an amount to be determined at trial plus late payment charges.

## COUNT IV
### (Breach of Level 3's Interstate Access Tariffs)

131.    Lumen incorporates each of the preceding paragraphs as if fully stated herein.

132.    Level 3's interstate access tariffs set forth the rates, terms, and conditions for providing interstate switched access and FGD services to customers, including Defendants.

133.    All interstate long-distance and toll-free calling exchanged between Level 3 (as a LEC) and Defendants (as the ultimate IXC) are governed by Level 3's interstate access tariffs, irrespective of the type of trunk group the calls traverse.

134.    Defendants' CIC 0110 scheme caused calls to be misrouted such that calls were routed over local trunks instead of FGD facilities.

135.    These calls are subject to switched access charges that Defendants are obligated to pay.

136.    Defendants breached the interstate access tariffs by refusing to pay these mandatory charges.

137.    As a direct and proximate result of Defendants' conduct, Level 3 has been damaged in an amount to be determined at trial plus late payment charges.

## COUNT V
### (Breach of Qwest Corporation's Intrastate Access Tariffs)

138.    Lumen incorporates each of the preceding paragraphs as if fully stated herein.

139.    Qwest's intrastate access tariffs set forth the rates, terms, and conditions for providing intrastate switched access and FGD services to customers, including Defendants.

140.    All intrastate long-distance and toll-free calling exchanged between Qwest (as a LEC) and Defendants (as the ultimate IXC) are governed by Qwest's intrastate access tariffs, irrespective of the type of trunk group the calls traverse.

141.    Defendants' CIC 0110 scheme caused calls to be misrouted such that calls were routed over LIS facilities instead of FGD facilities.

142.    These calls are subject to switched access charges that Defendants are obligated to pay.

143.    Qwest back-billed certain usage-based switched access charges on November 14, 2019 and back-billed certain facilities-based switched access charges in November 2020, and has since continued to assess these charges.

144.    Defendants breached (and continue to breach) the intrastate access tariffs by refusing to pay these mandatory charges.

145.    As a direct and proximate result of Defendants' conduct, Qwest has been damaged in an amount to be determined at trial plus late payment charges.

### COUNT VI
### (Breach of Level 3's Intrastate Access Tariffs)

146.    Lumen incorporates each of the preceding paragraphs as if fully stated herein.

147.    Level 3's intrastate access tariffs set forth the rates, terms, and conditions for providing intrastate switched access and FGD services to customers, including Defendants.

148.    All intrastate long-distance and toll-free calling exchanged between Level 3 (as a LEC) and Defendants (as the ultimate IXC) are governed by Level 3's intrastate access tariffs, irrespective of the type of trunk group the calls traverse.

149.    Defendants' CIC 0110 scheme caused calls to be misrouted such that calls were routed over local trunks instead of FGD facilities.

150.    These calls are subject to switched access charges that Defendants are obligated to pay.

151.     Defendants breached the intrastate access tariffs by refusing to pay these mandatory charges.

152.     As a direct and proximate result of Defendants' conduct, Level 3 has been damaged in an amount to be determined at trial plus late payment charges.

## COUNT VII
### (Breach of Qwest Corporation's Interconnection Agreements)

153.     Lumen incorporates each of the preceding paragraphs as if fully stated herein.

154.     Qwest entered into interconnection agreements with Defendants.

155.     Defendants breached those agreements by causing toll-free calls to be mis-routed over LIS facilities through its CIC 0110 scheme.

156.     Defendants breached those agreements by refusing to participate in discussions to create accurate LIS-Facility-PVU factors.

157.     Defendants breached those agreements by withholding information that would have allowed Qwest to create accurate LIS-Facility-PVU factors when these factors were originally set.

158.     As a direct and proximate result of Defendants' conduct, Qwest Corporation has been damaged in an amount to be determined at trial plus interest.

## COUNT VIII
### (Unjust Enrichment)

159.     Lumen incorporates each of the preceding paragraphs as if fully stated herein.

160.     Defendants received a benefit from Plaintiffs in the form of the switched access services provided by Lumen routing toll-free 8YY calls over local trunks instead of FGD trunks for which Defendants are required to pay switched access charges.

161.    Plaintiffs incurred an expense to provide this benefit to Defendants, including but not limited to the expenses of creating, maintaining, and operating the communications network used to provide this benefit to Defendants.

162.    Given the circumstances of this case, including the tariff and contractual provisions requiring Defendants to pay switched access charges for the switched access services Plaintiffs provide, it would be unjust for defendant to retain the benefit without compensation.

163.    Plaintiffs are therefore entitled to compensation for the benefit they provided to Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, as relief against Defendants, Lumen respectfully requests that the Court enter judgment in favor of Lumen and against Defendants ordering Defendants to pay damages and issuing appropriate injunctive relief due to Defendants' unjust and unreasonable practices, fraud, breaches of tariffs, and breaches of contracts in an amount to be determined at trial, plus late payment charges, interest, attorneys' fees, and costs, together with all other relief the Court may deem just and necessary.

Respectfully submitted this 8th day of November, 2021.

By: */s/ Charles W. Steese*
Charles W. Steese, Colo. Bar No. #26924
Douglas N. Marsh, Colo. Bar No. #45964
Kathleen F. Guilfoyle, Colo. Bar No. #55284
ARMSTRONG TEASDALE LLP
4643 South Ulster Street, Suite 800
Denver, Colorado 80237
Telephone: (720) 200-0676
csteese@armstrongteasdale.com
dmarsh@armstrongteasdale.com
kguilfoyle@atllp.com